IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**MARY GARCIA on behalf of**
**ALBERT J. GARCIA (a minor),**

      **Plaintiff,**

**vs.**                                                                   **No. 01cv0238 JP/JHG**

**JOANNE B. BARNHART,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

        This matter is before the Court on Plaintiff's (Garcia's) Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, to Remand for a Rehearing, filed October 22, 2001. The Commissioner of Social Security issued a final decision denying Garcia's application for Supplemental Security Income benefits. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and recommends that it be GRANTED.

        Garcia, filed her application for supplemental security income benefits on behalf of Albert J. Garcia (Albert) on June 17, 1998, alleging disability since October 1, 1997, due to fetal alcohol syndrome, a sleep disorder, a learning disability and attention deficit hyperactivity disorder (ADHD). The Commissioner denied Garcia's application for supplemental security income

---

[1] On November 9, 2001, JoAnne B. Barnhart was sworn in as Commissioner of the Social Security Administration. Thus, she is substituted as Defendant in this action.

benefits both initially and on reconsideration.  On July 25, 2000, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Albert had severe impairments consisting of ADHD, depression, and a specific learning disability in language.  Tr. 13.  However, the ALJ found Albert did not have any disorder or combination of disorders meeting or equaling in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1. *Id.*  In addition, the ALJ found Albert did not have a severe sleep disorder during the time period under review and that the fetal alcohol syndrome did not "even amount to a medically-determinable impairment-- much less a 'severe' impairment." *Id.*  The ALJ further found the testimony of Garcia and Albert was credible only to the extent it was consistent with the underlying record evidence.  Tr. 17.  The ALJ then found Albert did not have a combination of medically determinable physical or mental impairments that resulted in marked and severe functional limitations. *Id.*  Accordingly, the ALJ found Albert had not been under a disability at any time through the date of his decision.  Garcia filed a Request for Review of the decision by the Appeals Council.  On January 24, 2001, the Appeals Council denied Garcia's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Garcia seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

A child under eighteen years of age is "disabled" if the child, "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). A sequential three-step process guides the Commissioner's determination of whether a child meets this criteria. The ALJ must determine, in this order, (1) that the child is not engaged in substantial gainful activity, (2) that the child has an impairment or combination of impairments that is severe, and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20

3

C.F.R. Pt. 404, 20 C.F.R. § 416.924(a).[2]

If a child's impairment or combination of impairments does not meet or medically equal a listed impairment, the agency will assess all of the functional limitations caused by the child's impairment or combination of impairments. 20 C.F.R. § 416.926a(a). If the functional limitations caused by the child's impairments(s) are the same as the disabling functional limitations caused by a listed impairment, the agency will find that the child's impairment or combination of impairments is functionally equivalent in severity to a listed impairment. *Id.* The regulations provide four methods by which functional equivalence to a listed impairment may be established:

    (1)    **Limitation of specific functions**. We may find that your impairment(s) is functionally equivalent in severity to a listed impairment because of extreme limitation of one specific function, such as walking or talking.

    (2)    **Broad areas of development or functioning.** Instead of looking at limitation of specific functions, we may evaluate the effects of your impairment(s) in broad areas of development or functioning, such as social functioning, motor functioning, or personal functioning (i.e., self-care) and determine if your functional limitations are equivalent in severity to the disabling functional limitations in listing 112.12 or listing 112.02. If you have extreme limitations in one area of functioning or marked limitation in two areas of functioning, we will find that your impairment(s) is functionally equivalent in severity to a listed impairment.

---

[2] The regulations found at 20 C.F.R. § 416.926a were amended effective January 2, 2001. The amendments mark a major change in the evaluation process employed by ALJs in child disability cases and provide a single method of evaluation based only on domains of functioning. *See* 65 Fed.Reg 54747, 54755 (Sept. 11, 2000). However, the definitions and testing results for "marked" and "extreme" disabilities have not changed. *See id*. at 54756. The final rules which became effective January 2, 2001, revised the interim final rules but did not change the three-step sequential evaluation process or the basic standard for determining functional equivalence that requires a child to have a medically determinable impairment or combination of impairments that results in marked limitation in two domains or an extreme limitation in one domain. *Id.* The Commissioner contends that because the ALJ decided this case under the interim final rules the Court must review it under the interim rules and not the final rules. However, in this case, the result would be the same under either the interim rules or the final rules.

(3) **Episodic impairments**. If you have a chronic impairment(s) that is characterized by frequent illnesses or attacks, or by exacerbations and remissions, we may evaluate your functional limitations using the methods in paragraphs (b)(1) and (b)(2) of this section. However, your functional limitations may vary and we may not be able to use the methods in paragraphs (b)(1) and (b)(2) of this section. Instead, we may compare your functional limitation(s) to those in any listing for a chronic impairment with similar episodic criteria to determine if your impairment(s) has such a serious impact on your functioning over time that it is functionally equivalent in severity to one of those listings.

(4) **Limitations related to treatment or medication effects**. Some impairments require treatment over a long period of time (i.e., at least a year) and the treatment itself (e.g., multiple surgeries) causes marked and severe functional limitations. Marked and severe functional limitations may also result from the combined effects of limitations caused by ongoing treatment and limitations caused by an impairment(s).

20 C.F.R. § 416.926a(b)(1)-(4). There is no set order in which the agency must consider these methods, and the agency may not consider them all if it finds that a claimant's impairment(s) is functionally equivalent in severity to a listed impairment. 20 C.F.R. § 416.926a(b). However, the agency will consider all of the methods before it determines that a claimant's impairment(s) is not functionally equivalent in severity to any listed impairment. *Id.*

When the agency determines functional equivalence based on broad areas of development or functioning, the agency will evaluate the functional effects of a claimant's impairment(s) in several areas of development or functioning to determine if the claimant's functional limitations are equivalent in severity to the disabling functional limitations of listing 112.12 or listing 112.02. 20 C.F.R. § 416.926a(c). However, the agency refers to the areas of development or functioning described in paragraphs (c)(4) and (c)(5) of § 416.926a instead of referring to the areas of

5

development or functioning in listings 112.12 or 112.02. *Id.* Paragraph (c)(4)[3] describes the areas in general terms and paragraph (c)(5) as they apply to specific age groups. *Id.* If a claimant has "marked" limitations[4] in two areas of development or functioning, or "extreme" limitation[5] in one area, the agency will find that the claimant's impairment(s) is functionally equivalent in severity to listing 112.12 or listing 112.02, even if the claimant's impairment(s) is a physical impairment(s) or a combination of physical and mental impairments. *Id.*

Paragraph (c)(5)(v)(A) applies to this case and states as follows:

(v) Adolescents (age 12 to attainment of age 18). Children in this age group are evaluated in terms of five areas of functioning. The following are general descriptions of functioning typical of this age group.

(A) Cognitive/communicative functioning (age 12 to attainment of age 18): Your ability or inability to learn, understand, and solve problems through

---

[3] Paragraph (c)(4) sets out generally the areas of development or functioning that may be addressed in a finding of functional equivalence. Paragraph (c)(5) sets out the areas of development or functioning as they apply to specific age groups. Paragraph (c)(5)(v) applies to adolescents (age 12 to attainment of age 18). The areas covered for this age group are: (A) Cognition/communication functioning; (B) Motor functioning; (C) Social functioning; (D) Personal functioning; and (E) Concentration, persistence, or pace. *See* 20 C.F.R. § 416.926a(c)(v)(A)-(E).

[4] Marked limitation means: (A) when standardized tests are used as the measure of functional abilities, a valid score that is two standard deviations or more below the norm for the test (but less than three standard deviations); or (C) for children from age three to attainment of age eighteen, "more than moderate" and "less than extreme." Marked limitation may arise when several activities or functions are limited or even when only one is limited as long as the degree of limitation is such as to interfere seriously with the child's functioning. 20 C.F.R. § 416.926a(c)(3)(i)(A) & (C).

[5] Extreme limitation means: (A) When standardized tests are used as the measure of functional abilities, a valid score that is three standard deviations or more below the norm for the test; or (C) For children from birth to attainment of age 18, no meaningful functioning in a given area. There may be extreme limitation when several activities or functions are limited or even when only one is limited. 20 C.F.R § 416.926a(c)(3)(ii)(A) & (C).

6

intuition, perception, verbal and nonverbal reasoning, and the application of acquired knowledge; the ability or inability to retain and recall information, images, events, and procedures during the process of thinking, as in formal learning situations (e.g., composition, classroom discussion) and in daily living (e.g., using the post office, using public transportation). Your ability or inability to comprehend and produce language (e.g., vocabulary, grammar) in order to communicate in conversation (e.g., to express feelings, meet needs, seek information, describe events, tell stories), and in learning situations (e.g., to obtain and convey information and ideas) both spontaneously and interactively, in all communication environments (e.g., home, classroom, game fields, extra-curricular activities, job), and with all communication partners (e.g., parents, siblings, peers, school classes, teachers, employers).

20 C.F.R. § 416.926a(c)(5)(v)(A).

In support of her motion to reverse, Garcia makes the following arguments: (1) the ALJ erred in finding Albert had less than a "marked" impairment in the cognitive/communicative functioning area on the grounds that his grades were mostly Cs and his continued placement in special education classes was because of limited English proficiency; and (2) the ALJ's finding that Albert had no limitation in the social and personal functioning area is contrary to the evidence.

**Cognitive/communicative functioning**

Garcia contends the ALJ erred when he found Albert had less than a "marked" impairment in the cognitive/communicative functioning area merely because Albert's grades were mostly Cs and because his continued placement in special education classes was because of limited English proficiency. The Court agrees. Substantial evidence supports a "marked" impairment in this area.

On March 17, 1997, Albert was referred for special education testing. That report

indicated Albert was proficient in English. In fact, English was Albert's primarily language and the language used at home. Tr. 152. The "Language Indicators Checklist" indicated concerns in the following areas: (1) requires individual help; (2) misunderstands words and/or fails to grasp meanings; (3) easily distracted; (4) mind wanders;(5) poor recall; (6) limited vocabulary; (7) difficulty recalling details; (8) difficulty finding precise words; (9) difficulty recalling facts in a logical sequence; (10) does not verbalize willingly; (11) scattered thoughts; (12) inability to grasp the meaning of time; and (13) inability to generalize to a new situation. At this time, the evaluator found Albert met the criteria for Specific Learning Disability-Language.[6] Tr. 79. The evaluator found Albert met the criteria because he demonstrated "a significant deficit in one or more of the basic psychological processes involved in understanding or using spoken/written language (and other process functions)." In August of 1997, the evaluator noted that Albert's expressive language was very depressed in the general education setting. Tr. 70. The evaluator developed a program for Albert designed to develop his expressive and receptive language. Tr. 71.

On May 5, 1998, Albert's Individualized Education Program indicated he had been receiving language therapy for one hour a week since August 7, 1997. Tr. 51. At that time, the evaluator opined that "Albert's learning disability greatly affect[ed] his ability to perform in

---

[6] A Specific Learning Disability is defined as follows:

A disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in an inability to listen, think, speak, read, write, spell or to perform mathematical calculations. The term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. The term does not include children who have learning problems which are primarily the result of visual, hearing, or motor disabilities, of intellectual disability, or emotional disturbance, or of environmental, cultural or economic disadvantage. Tr. 79.

8

expressive and receptive language skills. His language difficulties has made it very difficult for him to be successful in general education." Tr. 51-52. Additionally, the IEP committee agreed that socio-economic, linguistic and cultural factors did not appear to be primarily the cause of Albert's language difficulties. Tr. 58.

On February 23, 1998, the speech and language pathologist (SLP) administered the Word Test-Revised. The scores on this test indicated that Albert continued to have significant difficulty with expressive language tasks. Tr. 53. Albert exhibited a long processing time and often asked to have the question/problem/statement repeated to him. *Id.* According to the evaluator, Albert's long processing time and need for repeating/rephrasing questions/information presented to him made it difficult for him to be successful in his regular classroom. *Id.* "His expressive language difficulties make it hard for him to participate successfully in classroom discussions or even in classroom writing activities." *Id.*

On April 14, 2000, the IEP committee opined that Albert continued to need a "reduced setting" due to his language and emotional needs. Tr. 144. At that time, Albert was receiving thirty hours of special education (15:1 setting), two hours of speech therapy per week and two hours of social work per month. The only time he was integrated with regular education students was during lunch, recess and physical education. *Id.* To assist Albert in succeeding in this highly structured environment, the IEP committee recommended the following modifications of Albert's environment: (1) preferential seating– front; (2) reduced assignments; (3) short instructions of one or two steps; (4) frequent feedback; (5) extra time for oral response; (6) exams of reduced length; (7) reduced homework load; (8) clearly defined limits; and (9) frequent reminder of rules. Tr. 145.

On April 14, 2000, the SLP opined that Albert continued to need general receptive and expressive language therapy to meet his goals. Tr. 154. According to the SLP, Albert continued to require a "structured environment where he is given time, multisensory ways of learning and opportunities for questions and clarifications." *Id.*

In his Decision, citing to Exhibit 16E, the ALJ found that "[i]n April 1999, the Special Education Department reevaluated Albert and decided to continue his placement in special education classes because of limited English proficiency. No other formal reason was given for Albert's placement in this program." Tr. 16. This finding is contrary to the evidence. *See* Exhibit 16E (Tr. 148)("Albert's first and primary language is English; Albert was identified as learning disabled in oral language); Tr. 154 (Albert continues to require a structured environment where he is given time, multi-sensory ways of learning and opportunities for questions and clarifications; Albert needs general receptive and expressive language therapy to meet his goals); Tr. 155 ( Albert needs to remain in special education for written, language, math and for some behaviors); Tr. 156 (student meets special education eligibility under the category of Specific Learning Disabled– Language).

The ALJ also found that there was no evidence whatsoever that Albert's expressive language was not understandable. Tr. 16. However, the record indicates Albert was receiving language therapy not because he could not enunciate words well but because he had difficulty expressing himself, misunderstood words and/or failed to grasp meanings, was easily distracted, had poor recall, had a limited vocabulary, had difficulty finding precise words, had difficulty recalling details, did not verbalize willingly, had difficulty recalling facts in a logical sequence, had scattered thoughts, and had an inability to generalize to new situations. Tr. 74. Albert also had

10

difficulty following along especially if there was a whole group discussion. *Id.* The evaluator found Albert had to have directions rephrased frequently or he would take cues from what other students were doing. *Id.*

Based on the foregoing, the Court finds that substantial evidence supports a "marked" impairment in the area of cognitive/communication functioning. In his Decision, the ALJ found that Albert has a marked impairment in the area of concentration, persistence and pace. The record supports this finding. Having found that Albert has marked limitation in two areas of functioning, the Court finds that the ALJ erred in not find Albert' impairment was functionally equivalent in severity to the required listings set out in § 416.926a(c). Accordingly, the Court will grant Garcia's Motion to Reverse and Remand for Payment of Benefits.

## **RECOMMENDED DISPOSITION**

The ALJ did not apply correct legal standards and his decision is not supported by substantial evidence. Garcia's Motion to Reverse and Remand for Payment of Benefits should be Granted.

**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**

## **NOTICE**

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.