IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARY GARCIA on behalf of
ALBERT J. GARCIA (a minor),

      Plaintiff,

vs.                                                                                                    Civ. No.  01-238 JP/JHG

JOANNE B. BARNHART,[1]
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


**MEMORANDUM OPINION**

      On February 28, 2001 Plaintiff, Mary Garcia (Garcia), filed a Complaint (Doc. No. 1) for judicial review of the Social Security Administration's denial of disability benefits for her grandson, Albert Garcia (Albert).  Plaintiff's case was referred to United States Magistrate Judge Joe H. Galvan for recommended findings and disposition.  On October 22, 2001 Plaintiff filed a Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, to Remand for a Rehearing (Doc. No. 9).  On May 22, 2002 the Magistrate Judge filed Proposed Findings and Recommended Disposition (Doc. No. 13) which determined that the decision by the administrative law judge was not supported by substantial evidence.  The Recommended Disposition concluded that the Court should reverse the ALJ's determination that Albert Garcia was not disabled and remand for the payment of disability benefits.  On May 29, 2002, the Commissioner for the Social Security Administration timely filed objections (Doc. No. 14) to the

---

      [1] On November 9, 2001, JoAnne B. Barnhart was sworn in as Commissioner of the Social Security Administration and is substituted as Defendant in this action.

Proposed Findings and Recommended Disposition under 28 U.S.C. § 636(b)(1). After reviewing the Commissioner's objections this Court has concluded that the Proposed Findings and Recommended Disposition should be modified and that the case should be remanded so the Social Security Administration can reassess whether Albert is disabled.

## BACKGROUND

On June 17, 1998 Garcia filed an application for supplemental security income benefits for her grandson, Albert. Garcia's application alleged that Albert had been disabled since October 1, 1997. The Social Security Administration (Agency) denied Garcia's request initially and on reconsideration. Garcia then petitioned for review by an administrative law judge (ALJ). On July 25, 2000 the ALJ found that Albert did not qualify for a listed impairment. Further, the ALJ determined that although Albert had a "marked" impairment in the developmental area of concentration, persistence, and pace, he had a "less than marked" impairment in the developmental area of cognitive/communicative functioning. R.P. at 16. Accordingly, the ALJ concluded that Albert was not disabled. R.P. at 17.

Garcia filed a Request for Review of the ALJ's decision by the Agency's Appeals Council. On January 24, 2001, the Appeals Council denied Garcia's request to review the ALJ's decision, which effectively made the ALJ's decision the Agency's final decision. Garcia now seeks judicial review of that decision under 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

This Court reviews an ALJ's decision to determine (1) whether it was supported by substantial evidence and (2) whether it applied the correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). The record as a whole

must be reviewed to determine whether an ALJ's decision is supported by substantial evidence. In determining a child's disability an ALJ must discuss both the evidence supporting his decision and "significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). While this Court is not at liberty to reweigh the evidence presented to an ALJ, *Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), it must ensure that the ALJ does not "ignore evidence that does not support his decision, especially when that evidence is significantly probative." *Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

**DISCUSSION**

A child under eighteen years of age is disabled if the child, "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). A sequential three-step process is used to determine whether a child qualifies as disabled. Under that process an ALJ must determine (1) whether the child is engaged in substantial gainful activity, (2) whether the child has an impairment or combination of impairments that is severe, and (3) whether the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404. *See* 20 C.F.R. § 416.924(a).[2]

---

[2] Here the ALJ applied the interim regulations adopted in response to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 to determining whether Albert was disabled. 62 Fed. Red. 6408 (February 22, 1997). Although these regulations were superceded by final regulations, 65 Fed.Reg 54747, 54755 (Sept. 11, 2000), the regulations governing the legal issues here did not significantly change. As the outcome of this case would be the same under either set of regulations, the Court will cite to and quote from the interim rules. 65 Fed. Reg. 54, 751 (requesting that any judicial review use the rules applied by the ALJ).

When a child's impairment does not meet the criteria for a listed impairment under step three of the sequential analysis an ALJ must assess whether the child's functional limitations are equivalent in severity to a listed impairment. 20 C.F.R. § 416.926a(a). In determining disability in children the regulations provide four methods by which functional equivalence to a listed impairment may be established. They are:

(1) **Limitation of specific functions**. We may find that your impairment(s) is functionally equivalent in severity to a listed impairment because of extreme limitation of one specific function, such as walking or talking. . . .

(2) **Broad areas of development or functioning.** Instead of looking at limitation of specific functions, we may evaluate the effects of your impairment(s) in broad areas of development or functioning, such as social functioning, motor functioning, or personal functioning (i.e., self-care) and determine if your functional limitations are equivalent in severity to the disabling functional limitations in listing 112.12 or listing 112.02. If you have extreme limitations in one area of functioning or marked limitation in two areas of functioning, we will find that your impairment(s) is functionally equivalent in severity to a listed impairment. . . .

(3) **Episodic impairments**. If you have a chronic impairment(s) that is characterized by frequent illnesses or attacks, or by exacerbations and remissions, we may evaluate your functional limitations using the methods in paragraphs (b)(1) and (b)(2) of this section. However, your functional limitations may vary and we may not be able to use the methods in paragraphs (b)(1) and (b)(2) of this section. Instead, we may compare your functional limitation(s) to those in any listing for a chronic impairment with similar episodic criteria to determine if your impairment(s) has such a serious impact on your functioning over time that it is functionally equivalent in severity to one of those listings. . . .

(4) **Limitations related to treatment or medication effects**. Some impairments require treatment over a long period of time (i.e., at least a year) and the treatment itself (e.g., multiple surgeries) causes marked and severe functional limitations. Marked and severe functional limitations may also result from the combined effects of limitations caused by ongoing treatment and limitations caused by an impairment(s). . . .

20 C.F.R. § 416.926a(b)(1)-(4).  Although an ALJ does not have to consider each method once a child's disability has been established, the ALJ must consider each method before deciding that a child is not disabled because his or her impairment is not functionally equivalent to any listed impairment.  20 C.F.R. § 416.926a(b).

When an ALJ measures functional equivalence based on a child's broad areas of development or functioning, the ALJ assesses a child's limitations in five developmental areas to see if any are functionally equivalent in severity to those described under listings 112.12 and 112.02.  20 C.F.R. § 416.926a(c).  An ALJ does not refer to the listed impairments to determine functional equivalence, but rather applies the legal standards under subparts (c)(4) and (c)(5) of Section 416.926a.  Subpart (c)(4) sets out these standards in general terms and subpart (c)(5) outlines how they apply to age-specific groups.[3]  *Id.*  If a child has a marked limitation[4] in two or more areas of development or functioning,[5] or an extreme limitation in one area, the ALJ must find that the child is disabled.  20 C.F.R. § 416.926a(b)(2).

---

[3] Subpart (c)(5)(v) applies to children from age 12 to the attainment of 18 and covers the developmental areas of (A) Cognition/communication functioning, (B) Motor functioning, (C) Social functioning, (D) Personal functioning, and (E) Concentration, persistence, or pace.  20 C.F.R. § 416.926a(c)(v)(A)-(E).

[4] A marked limitation is defined as follows:  "(A) When standardized tests are used as the measure of functional abilities, a valid score that is two standard deviations or more below the norm for the test (but less than three standard deviations); or . . . (C) for children from age 3 to the attainment of age 18, 'more than moderate' and 'less than extreme.'  Marked limitation may arise when several activities or functions are limited or even when only one is limited as long as the degree of limitation is such as to interfere seriously with the child's functioning."  20 C.F.R. § 416.926a(c)(3)(i)(A) & (C).

[5] The ALJ concluded that Albert had a marked limitation in concentration, persistence, or pace.  R.P. at 16.  The Commissioner has not challenged that ruling on appeal.  Doc. No. 11 at 11.

The Commissioner has objected to the Magistrate Judge's recommendation that this Court reverse the ALJ's determination that Albert did not have marked limitation in his cognitive and communicative functioning. As Albert was thirteen when the ALJ decided his case, R.P. at 12, the ALJ had to assess Albert's

> ability or inability to learn, understand, and solve problems through intuition, perception, verbal and nonverbal reasoning, and the application of acquired knowledge; the ability or inability to retain and recall information, images, events, and procedures during the process of thinking, as in formal learning situations (e.g., composition, classroom discussion) and in daily living (e.g., using the post office, using public transportation). [Albert's] ability or inability to comprehend and produce language (e.g., vocabulary, grammar) in order to communicate in conversation (e.g., to express feelings, meet needs, seek information, describe events, tell stories), and in learning situations (e.g., to obtain and convey information and ideas) both spontaneously and interactively, in all communication environments (e.g., home, classroom, game fields, extra-curricular activities, job), and with all communication partners (e.g., parents, siblings, peers, school classes, teachers, employers).

20 C.F.R. § 416.926a(c)(5)(v)(A). The ALJ found that Albert did not have a marked limitation under this developmental category because (1) the only formal reason for Albert placement in special education was his "limited English proficiency," (2) "there is no evidence whatsoever that Albert's expressive language is not understandable," and (3) Albert's grades "were mostly 'C's," which demonstrated that he could perform academically. R.P. at 16. Plaintiff has argued, correctly, that the ALJ ignored significantly probative evidence that was contrary to his decision. *Briggs,* 248 F.3d at 1239.

As the standard for cognitive/communicative functioning shows, this functional area is not concerned just with a child's ability to make himself understood by others or the superficial appearance of a child's grades in school. Under this functional heading an ALJ also must assess

6

(1) the child's "ability or inability to retain and recall information, images, events, and procedures during the process of thinking, as in formal learning situations (e.g., composition, classroom discussion)" and (2) the child's "ability or inability to comprehend . . . language . . . in order to communicate . . . in learning situations. 20 C.F.R. § 416.926a(c)(5)(v)(A). The record reveals substantial evidence that Albert had a significant problem with his ability to process information which impacted both of these areas. If fact, Albert's inability to process language was the reason that he was placed in special education.[6] Albert's "limited English proficiency," or as the ALJ characterized it, Albert's ability to speak English, was not a factor in Albert's being classified as Specific Learning Disabled - Language.

The record shows that although Albert was proficient in English, he "was referred for special education testing due to difficulty completing assignments and difficulty focusing on tasks." R.P. at 73. In 1997 Albert's initial examination concluded that he qualified for special education because he had "a significant deficit in one or more of the basic psychological processes involved in understanding or using spoken/written language (and other process functions)." R.P. at 79-80. Due to Albert's inability to process written and spoken verbal information Albert's initial screening report recommended that his teachers "[r]epeat/rephrase directions in order to increase the probability of Albert's understanding" and to "[e]ncourage Albert to ask for clarification of directions for classroom assignments." R.P. at 78. This kind of evidence appears throughout the record.

---

[6] There is also ample evidence that Albert's expressive language skills were deficient in the classroom setting. *E.g.*, R.P. at 70 (noting in August of 1997 that Albert's "expressive language is very depressed in the general education setting").

For instance in 1998 a speech and language pathologist tested Albert using The Word Test - Revised. Albert scored in the one percentile range. R.P. 53. The speech and language pathologist noted that Albert "exhibited a long processing time and often asks to have the question/problem/statement repeated." *Id*. Over the intervening years this problem resulted in Albert being removed from a general education setting, where he was placed in 1997, R.P. at 70, to a highly structure special education environment for thirty hours a week in 2000, R.P. at 144. As Albert's 1998 educational plans noted, "he continues to need services for auditory processing skill to support the development of receptive & expressive language." R.P. at 206. This problem was corroborated by the independent psychologist the Agency hired to evaluate Albert, Dr. Esther D. Davis. Dr. Davis concluded that Albert had problems "processing verbal information" and that his "Process Speed Factor" was "in the Intellectually Deficient range of ability." R.P. at 187.

None of this type of evidence was addressed by the ALJ who chose, instead, to focus on his personal ability "to understand Albert's verbal responses at the hearing," and Albert's grades, which the ALJ noted were mostly C's. R.P. at 15. However, Albert's ability to speak to those in his presence represents only a fraction of the standard for assessing his communicative functioning, which also includes Albert's ability or inability to comprehend language in order to communicate "in learning situations (e.g. to obtain and convey information and ideas)." 20 C.F.R. § 416.926a(c)(5)(v)(A). And although the ALJ found that Albert's grades for the 1998-99 school year were indicative of his overall cognitive abilities,[7] the ALJ failed to discuss how Albert's grades related to his specific ability to retain and recall information during the process of

---

[7] In February of 1999 Albert's six-grade teacher noted that Albert was performing at the fourth to fifth grade level. R.P. at 131.

thinking under 20 C.F.R. § 416.926a(c)(5)(v)(A), or to address Albert's highly structured setting in special education as required under 20 C.F.R. § 416.924c(d). *McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002) (noting that a claimant's medication and structured environment are factors that must be addressed because they contribute to the appearance of an improved condition). On this point it is significant that Albert's spring grades for 1999 were not measured against his peers's grades, but rather were based on Albert meeting the goals outlined in his individualized education plain (IEP). R.P. 211-12 (basing Albert's grades on his IEP objectives beginning April 15, 1999). Albert's 1999 IEP restructured his educational format so that he had additional time to complete any academic assignment, including his oral and written responses in class and on his exams.[8]

Because the evidence of Albert's language processing problems were not properly addressed under the interim regulations the Court finds that the ALJ erred in reaching his decision that Albert did not have a marked limitation in his cognitive/communicative functioning.[9] *Briggs*, 248 F.3d at 1239. However, this Court is mindful that a district court cannot "reweigh the evidence or substitute [its] judgment for the Commissioner's," even though had it been "the fact finder [it] may well have reached a different conclusion concerning the weight" to be given to the

---

[8] In April of 2000 Albert's multidisciplinary team performed the latest evaluation in the record. To address Albert's problem with language processing the team decided to place Albert in the front row of his special education class, to provide him with short instructions, frequent feedback, extra time for oral responses, reduced, taped assignments, and short exams. R.P. 145.

[9] More importantly, the ALJ applied the wrong legal standard to measure Albert's cognitive/communicative functioning. At Albert's hearing the ALJ described the cognitive portion of the standard as "mentally how's he doing, what's his I.Q, is he intelligent or not, does he have a lot of problems there." R.P. at 230. According to the ALJ, "communicative means do people understand him when he talks and speaks." *Id*.

9

evidence.  *White v. Massanari*, 287 F.3d 903, 908 (10th Cir. 2001); *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) ("Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of our abundant deference to the ALJ, remand the case for further administrative proceedings") (internal punctuation omitted).  A remand is appropriate so that the ALJ can reassess all of Albert's impairments in the area of his cognitive and communicative functioning.

In addition, the Court notes that the ALJ summarily dismissed Garcia's claim that Albert suffered from fetal alcohol syndrome (FAS) because "a review of the medical records does not show that any doctor or psychologist ever diagnosed this syndrome."  R.P. at 13.  Portions of the record that address Albert's FAS do not support this finding.  Although the transcript of the hearing before the ALJ is less than clear, it appears that Garcia testified that Albert's two brothers were receiving SSI disability benefits due to FAS, R.P. 235 & 244, and that Albert had FAS, R.P. at 244.  Albert's school records indicate that "Albert has been diagnosed with Fetal Alcohol Syndrome."  R.P. at 74 & 217.  Dr. Sievert, who treated Albert at Charter Hospital, noted in his chart that Albert's brothers had FAS in their psychiatric history.  R.P. 178.  These reports are consistent with Dr. Davis's comment that the "record indicates, and Albert's grandmother confirms, that his mother was using alcohol and other drugs throughout her pregnancy."  R.P. at 184.  Given that the medical information from Albert's medical sources indicates that Albert was exposed to alcohol in utero, the ALJ should have inquired further about Albert's FAS claim.  20 C.F.R. § 416.912(e)(1).  The ALJ should have found out from Albert's treating pediatric physician, R.P. at 225, whether Albert had been diagnosed with FAS before discounting the possibility entirely.

A diagnoses of FAS could be crucial to Albert's disability claim since a documented neurological disorder may qualify him for a listed impairment. *Roelandt ex rel. Roelandt v. Apfel*, 125 F. Supp.2d 1138, 1146 (S.D. Iowa 2001) (noting that fetal alcohol syndrome may qualify as a disability since it is "a brain disorder of children impaired in utero by maternal alcohol consumption," quoting Barbara A. Morse, Information Processing: Identifying the Behavior Disorders of Fetal Alcohol Syndrome, in Fantastic Antone Succeeds: Experiences in Educating Children with Fetal Alcohol Syndrome 26-27 (1993, Judith S. Kleinfeld and Siobhan Wescott, editors)); *e.g.* Listing 111.09. On remand the ALJ should evaluate appropriately Garcia's claim that Albert suffers from FAS.

The Recommended Disposition did not examine Garcia's claim that the ALJ failed to address evidence which showed that Albert's had marked social and personal functioning limitations.[10] There is probative evidence concerning Albert's behavioral social problems, like his documented oppositional defiant disorder, R.P. at 189, and his inclination to "rarely participate in social games, etc. with his peers," R.P. at 52, which should be formally addressed and explicitly discounted on remand should the ALJ continue to adhere to his conclusion that Albert does not have a marked limitation in either of these areas.

**CONCLUSION**

This case is remanded for further administrative proceedings consistent with this opinion.

_____
CHIEF UNITED STATES DISTRICT JUDGE

---

[10] Although the ALJ treated social and personal functioning as though they were one "broad area of functioning." R.P. at 16, they are two distinct areas of functioning that the regulations treat separately. 20 C.F.R. § 416.926a(c)(5)(v)(C) & (D).